AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

FILED

for the

MAY 1 5 2019

Eastern District of California

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| ARA GARABED DOLARIAN | ) | Case No.   1: 1 9 MJ  0 0 1 0 6 EPG |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of    APRIL 2014 - FEBRUARY 2015    in the county of    FRESNO    in the

EASTERN    District of    CALIFORNIA    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 22 U.S.C. § 2778 | Illegal Arms Brokering |
| 18 U.S.C. §§ 1956 & 1957 | Money Laundering and Conspiracy |

This criminal complaint is based on these facts:

See Affidavit of Jeremy Kiser, attached hereto and incorporated herein,

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jeremy Kiser, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    5/15/19

_____
*Judge's signature*

City and state:    Fresno, California

Hon. Erica P. Grosjean, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF SPECIAL AGENT JEREMY KISER

I, Jeremy Kiser, being duly sworn, do hereby depose and state as follows:

## I.    INTRODUCTION AND BACKGROUND

1.    I am a Special Agent with Homeland Security Investigations (HSI) and have been so employed for approximately ~~nine~~ this teen/ years. Prior to my employment with HSI, I served as a U.S. Customs and Border Protection Officer for three years. As a requirement for my employment as an HSI Special Agent, I successfully completed a twelve week Criminal Investigator Training Program (CITP) located at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. At the conclusion of CITP, I completed an additional twelve weeks at the Immigration and Customs Enforcement Special Agent Training Academy. As part of my training at FLETC, I received extensive instruction in the areas of immigration law, customs law, firearms training, rules of evidence, and interview techniques.

2.    As a Special Agent with HSI, my duties include, among other things, the investigation of criminal violations of import/export law and violations of the Arms Export Control Act ("AECA") as proscribed by 22 U.S.C. § 2778, and the International Traffic in Arms Regulations ("ITAR"), as proscribed by 22 C.F.R Part 120, et. seq. Moreover, as a HSI Special Agent, your affiant is generally authorized to investigate violations of the laws of the United States and to execute search and seizure warrants issued under the authority of the United States.

3.    I am familiar with federal criminal laws relating to the unlawful export of arms and commodities from the United States, as determined by the Department of State (DOS), Directorate of Defense Trade Controls (DDTC), the Department of Commerce (DOC), Bureau of Industry and Security (BIS), and the Department of the Treasury, Office of Foreign Assets Control (OFAC), as these agencies have statutory responsibility and authority to regulate this

1

area.

4.    I have also participated in investigations of violations of United States laws relating to the unlawful export of arms and commodities that are export-restricted for reasons of national security, foreign policy, and anti-terrorism. Furthermore, your affiant has received training related to identifying the techniques, methods, and procedures employed by groups, organizations, and companies that violate United States export/brokering laws. Finally, your affiant has received specific instruction and training in the conduct of criminal investigations associated with export/brokering law violations, which included investigative techniques associated with violations of the AECA and ITAR. Specifically, in addition to my basic training outlined above, I attended an advanced two-week Arms and Strategic Technology Investigation seminar, where I received advanced instruction in the areas of the AECA, ITAR, Export Administration Regulations, and Trading with the Enemies Act.

5.    Based on my training, education, experience and discussions with other federal agents related to the investigation of international export/brokering related violations, I know that maintaining an unlawful export/brokering scheme is often labor intensive, in that it involves: (1) the procurement of defense articles from various sources within and/or without the United States; (2) extensive dealings with foreign nationals from foreign countries requesting defense articles; (3) arrangements related to the international exportation of various defense articles from the United States and/or foreign countries to other foreign countries; (4) certain unlawful conduct committed in furtherance of concealing or evading the prohibitions and licensing requirements of the AECA and the ITAR; and (5) the maintenance of business records related to and resulting from the exportation and/or brokering of defense articles and the accrual of illegally derived profits from these activities.

2

6.     The facts in this affidavit come from my personal observations, training, and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant, and does not necessarily set forth all of my knowledge about this matter.

7.     This affidavit is submitted in support of an application for a criminal complaint against **ARA GARABED DOLARIAN**, a U.S. citizen, for violations of Title 18, United States Code, Section 371 (Conspiracy); Title 22, United States Code, Section 2778 (Illegal Arms Brokering); Title 22, Code of Federal Regulations, Parts 127 and 129; and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering).  As set forth below, I have probable cause to believe that **DOLARIAN** has committed the above-referenced offenses and a warrant for his arrest should be issued.

## II.     SUMMARY OF PROBABLE CAUSE

8.     As described below, no U.S. person may conduct "brokering activities" without registering with and receiving approval from the U.S. Department of State.  Brokering activities include any actions to facilitate the transfer of defense articles.  Such activities include (but are not limited to) any financing that facilitates the import or export of a defense article or defense service.  **ARA DOLARIAN**, though his company, Dolarian Capital Inc. ("DCI"), is an international arms broker.  Beginning in or around June 2014, **DOLARIAN** and his affiliates brokered or attempted to broker the transfer of defense articles from Europe to Nigeria. **DOLARIAN** and his affiliates did this without written or other approval from DDTC.

9.     Specifically, (1) in early June 2014, **DOLARIAN** (through DCI) entered into Sales Agreements with Nigerian government entities for the sale of weapons, which were valued at approximately $8.6 million; (2) in or around September 2014, **DOLARIAN**, via DCI,

3

negotiated with arms vendors in Europe and made payments to such vendors for the acquisition

of weapons intended to be transferred to Nigeria; and (3) DCI received approximately $8.6

million in wire transfers from Nigeria through a series of intermediaries. The $8.6 million

appears to be payments for the weapons **DOLARIAN** brokered for transfer to Nigeria between

June and September 2014. These funds were not held in escrow, but were used in part to pay a

**DOLARIAN** affiliate in the Czech Republic and other expenses, such as **DOLARIAN**'s

federal and state tax debts. All of these actions were taken without prior approval from DDTC

and constitute violations of federal law, as set forth above.

### III.   APPLICABLE LAW

10.     The Arms Export Control Act (AECA), 22 U.S.C. § 2778, regulates the export, import

and brokering of defense articles and defense services. The AECA authorizes the President to

"designate those items which shall be considered as defense articles," and "promulgate

regulations for the import and export of such articles. . . ." 22 U.S.C. § 2778(a)(1). The

President has delegated rulemaking authority to the Secretary of State, whose office has

promulgated the International Traffic in Arms Regulations (ITAR). 22 C.F.R. §§ 120.1-130.17.

The ITAR contain the U.S. Munitions List ("USML" or "Munitions List"), which provides

categories of "defense articles" that cannot be exported without first obtaining a license from

the Department of State (DOS). 22 U.S.C. § 2778(b)(2); 22 C.F.R. §§ 120.6, 121.1, 123.1(a),

129.3.

11.     Individuals engaging in brokering defense articles are required to both register with DOS

and obtain specific authorization/licensing from DOS before engaging in such brokering. 22

U.S.C. § 2778(b)(1)(A)(ii)(I)-(III).

12.     The ITAR defines a broker as any person "who engages in the business of brokering

4

activities." 22 C.F.R. § 129.2(a). A broker includes (1) any U.S. person wherever located; (2) any foreign person located in the United States; and (3) any foreign person located outside the United States where the foreign person is owned or controlled by a U.S. person." 22 C.F.R. § 129.2(a)(1)-(3).

13. The ITAR defines "brokering activities" as "any action on behalf of another to facilitate the manufacture, export, permanent import, transfer, reexport, or retransfer of a U.S. or foreign defense article or defense service, regardless of its origin." 22 C.F.R. § 129.2(b). Such action includes, but is not limited to: (i) financing, insuring, transporting, or freight forwarding defense articles and defense services; and (ii) soliciting, promoting, negotiating, contracting for, arranging, or otherwise assisting in the purchase, sale, transfer, loan, or lease of a defense article or defense service. 22 C.F.R. § 129.2(b)(1)(i)-(ii). Brokering activities also include activities performed by an affiliate. 22 C.F.R. § 129.2(b)(v). Further, engaging in the business of brokering activities requires only one occasion of brokering. 22 C.F.R. § 129.2(c).

14. "Foreign defense articles or defense service" includes any non-United States defense article or defense service of a nature described on the United States Munitions List regardless of whether such article or service is of United States origin or whether such article or service contains United States-origin components. 22 U.S.C. 2778(b)(1)(A)(ii)(IV).

15. A person who is convicted of willfully violating the AECA or the ITAR shall be imprisoned for not more than twenty years or fined up to $1 million. 22 U.S.C. § 2778(c).

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   Background on Ara Dolarian and Dolarian Capital Inc.

16. I am currently conducting an investigation into the unauthorized brokering activities of **ARA DOLARIAN**, DCI, and others affiliated with or working on behalf of **DOLARIAN**.

5

17.    DCI is a company incorporated and registered in the state of California. **DOLARIAN** is

the President, Chief Executive Officer, and Chief Financial Officer of DCI.

18.    An older version of DCI's website, at www.dolarian.com, stated that DCI was registered

with the DDTC as a broker and manufacturer. The website also advertised a variety of arms

ranging from tanks to rifles and pistols. A current version of the site states the following[1]:



**DOLARIAN CAPITAL, INC.**
DEFENSE TRADING COMPANY

LOGISTICS:            OVERLAND, SEA, & AIR
PROCUREMENT:          WEAPONS ABATEMENT
ARTICLES:             STANDARD & NON-STANDARD USML
WAREHOUSING:          UNITED STATES & EUROPE

FRESNO CALIFORNIA, WASHINGTON D.C., & SOFIA BULGARIA
INFORMATION AND CATALOG CONTACT: DOLARIAN@DOLARIAN.COM

REGISTERED AND LICENSED BY UNITED STATES DEPARTMENT OF JUSTICE AND DEPARTMENT OF STATE

19.    DDTC in response to a law enforcement request revealed that **DOLARIAN** as the

President/CEO of DCI is registered as a broker with brokering registration code K2179. In as

late as 2011, DCI received DDTC approval to engage in certain select brokering activity.

According to DDTC records, however, all DCI brokering and export license applications

submitted in 2013 and 2014 were returned without action[2] or were denied. This means that

during 2013 and 2014, DCI did not have a license or other written authorization from DDTC to

---

[1] This image from the site was taken on May 10, 2019.
[2] "Returned without action" means a denial without prejudice to resubmit.

6

export arms or conduct arms brokering activities.

20. · On June 20, 2013, DDTC placed **DOLARIAN** under a policy of presumptive denial. The notification sent to **DOLARIAN** read:

> This letter is to inform you that until the Department has completed its review and is satisfied that Dolarian Capital is compliant with the ITAR and has an effective defense trade and brokering compliance program in place, all pending and future license applications or other approval requests involving you or Dolarian Capital will be reviewed under a presumption of denial. Following a case-by-case review, exceptions may be granted, however, where the Department determines approval would be in the best interests of U.S. foreign policy or national security.

21. In November 2014, DDTC conducted a meeting and interview with DCI, attended by **DOLARIAN** and M.S., **DOLARIAN**'s business partner and DCI's purported in-house counsel. This meeting was conducted in connection with an administrative investigation DDTC was conducting into Dolarian and DCI in connection with arms brokering activities.

22. On December 8, 2014, **DOLARIAN** submitted a written response to the DDTC inquiry. This response included a summary of **DOLARIAN**'s/DCI's activities in 2013 and 2014, as well as several exhibits, which included signed contracts, End User Certificates, correspondence to the DDTC and email communications between **DOLARIAN** and his representatives/affiliates. In January 2015, DDTC provided me a copy of this correspondence and the exhibits. Several exhibits provided to DDTC are detailed in this affidavit.

### B.   Illegal Nigerian Brokering Activity

23. On September 2, 2014, I received bank records from JP Morgan Chase in reference to DCI, **DOLARIAN** and M.S. These records, in conjunction with certain statements **DOLARIAN** made to US Customs and Border ("CBP") officers (described in further detail below), and other facts described below, indicated to me that **DOLARIAN** and DCI were conducting arms brokering activities without the necessary DDTC licenses or approvals. A

7

summary chart of the financial activities outlined in this affidavit is provided below in this affidavit.

24.     The JP Morgan Bank records revealed that on June 17, 2014, M.S. received a wire transfer of $4,998,647.00 into a newly opened JP Morgan checking account, number 588102975, in Fresno, California ("M.S.'s Checking Account #2975").  M.S. opened the account on April 21, 2014.

25.     The $4,998,647.00 wire transfer was drawn on an HSBC-Hong Kong bank account, number 640116927838 (the "Sawki HSBC Account"), held in the name of a Hong Kong-based company, (HK) SK-Sawki Limited ("Sawki").

26.     An open source records check of the Hong Kong Government business database indicated that Sawki was established in Hong Kong by two Niger citizens named Kabirou Abdoulkadri and Souleymane Siddo.  These same records show that Abdoulkadri and Siddo reside in China. Additional open source record checks indicated that Sawki is listed as a furniture company and has an internet presence as SK-SAWKI FURNITURE CO LIMITED, www.sksawkifurniture.abbo-twins.com.

27.     HSBC records indicated that just weeks before the June 17, 2014 wire transfer to M.S., the Sawki HSBC Account received two wire transfers of $9,999,990 (for a total of $19,999,980) from the National Security Adviser Office, Three Arms Zone, Abuja, Nigeria (NSAO).  The first wire transfer was sent on May 28, 2014 from an NSAO account at the Central Bank of Nigeria in Lagos, Nigeria; the second wire transfer was sent on June 9, 2014 from an NSAO account at the First Bank of Nigeria PLC in London, England.  A notation for the second wire transfer indicated that the transfer was "Payment for Supply of Technical Equipment."

28.     I conducted online research and found that the National Security Adviser Office is an

8

entity of the Nigerian Government under the Office of the President and is located in the Three

Arms Zone of Abuja, Nigeria. According to the United States Defense Attaché for Nigeria, the

NSAO was allotted roughly $1 billion by the Nigerian Government in 2014 for the purchase of

military equipment. The Defense Attaché advised that each branch of the Nigerian Armed

Forces as of February 2015 submits their military equipment requests through the NSAO.

29.     According to documents furnished by DCI to DDTC, on June 4, 2014—just 13 days

before the $4,998,647.00 wire transfer from Sawki— **DOLARIAN** executed two sales

agreements with H.A., owner of Socite D' Equipments Internaionaux ("S.E.I."), one for the

purchase of 20mm auto-cannons (large caliber machine guns), and the second for 20mm

ammunition, both for the Nigerian Ministry of Defense. The stated value of the contracts was

$3,925,000.00.

30.     I conducted online research and found that S.E.I has been involved in the attempted

procurement of weapons on behalf of the Nigerian Government. Multiple online news articles

detailed that S.E.I. was involved in an arms transaction with Cerberus Risk Solutions, a South

African arms brokerage company. The South African government reportedly seized $5.7

million wired to Cerberus by S.E.I. because Cerberus lacked the proper registration to sell and

market arms in South Africa.    Further, checks in U.S. government databases revealed that

S.E.I. has been listed as the consignee (receiving party) on two exports of fuel tanker trucks to

S.E.I. in Niger. Both transactions listed H.A. as the point of contact for S.E.I.

31.     According to documents furnished by DCI to DDTC, in June of 2014, **DOLARIAN**

executed a third sales agreement with H.A. and S.E.I. for the purchase of the munitions listed

below on behalf of Nigeria:

Weapon/Munitions

> DEFA Type 553 gun
> Arming wire for 125kg bomb ARM MLE FZA
> Arming wire for 250kg bomb SECU MLE FZA
> Arming wire for 250kg bomb SAMP MLE FZA
> MARTA 155 Type Launch Pad
> 100kg bomb HE
> 250kg bomb
> DEFA ammunition
> Pylon, F71A
> 68 mm SNEB Rocket

The stated price of this third contract was valued at $8,616,042.50.

32.     The DEFA 553 is a gas-operated five-chamber revolving cannon using pyrotechnic

cocking and electrical ignition. It fires a range of 30 mm ammunition in various types, and is

capable of continuous fire or of 0.5-second or 1-second bursts.  Based on my training and

experience and review of the ITAR Section 121.1, the DEFA 553 is a defense article and is

Category II (a), Guns over caliber .50 (12.7mm, whether towed, airborne, self-propelled, or

fixed, including but not limited to, howitzers, mortars, cannons and recoilless rifles).

33.     The MATRA 155 launch pad is a SNEB rocket launcher which launches unguided air-to-

ground 68 mm (2.7 in) rocket projectiles. The MATRA 155 launch pad designed for launch by

combat aircraft and helicopters. Based on my training and experience and review of the ITAR

Section 121.1, both the MATRA 155 and its 68mm rockets are defense articles on the USML

and therefore subject to the State Department's licensing requirements.

34.     The 250kg Bomb HE and 100kg Bomb HE are thick-walled metal cased projectiles with

explosive filler. These bombs are a common weapon of fighter bomber and attack aircraft.

Based on my training and experience and review of the ITAR Section 121.1, these bombs are

also on the USML.

35.     On or about June 19, 2014, DDTC received a Brokering Application from DCI.  DDTC

assigned tracking number "BA-L-039-14" to DCI's application package. This application

package was received two days after M.S. received the $4,998,647.00 wire from Sawki.

36.     In the brokering application, **DOLARIAN** and DCI requested permission to broker the

sale of certain defense articles listed below to the Ministry of Defense, Nigerian Army.

Contained in the application package is an equipment list that details the following munitions

DCI sought to sell to Nigeria:

>                    20x110mm ammunition
>                    20x110mm auto cannon
>                    DEFA 155 type gun
>                    Arming wire for 125kg bomb ARM MLE FZA
>                    Arming wire for 250kg bomb SECU MLE FZA
>                    Arming wire for 250kg bomb SAMP MLE FZA
>                    MARTA 155 Type Launch Pad
>                    Pylon, F71A
>                    100kg bomb HE
>                    250kg bomb

37.     Most of the items detailed in brokering application BA-L-039-14 are the same items

listed in the executed sales agreements detailed above—many of which are "defense articles"

under ITAR.

38.     While DCI's June 19, 2014 brokering request was pending with DDTC, DCI,

**DOLARIAN** and M.S. conducted a series of financial transactions in the United States with the

proceeds of the $4,998,647.00 wire transfer they had received from Nigeria through Sawki.

39.     On or about June 20, 2014, **DOLARIAN** and DCI opened two new bank accounts with

JP Morgan Chase: (1) a business savings account in the name of DCI with JP Morgan Chase,

which was assigned account number 3097758329 ("#8329") with **DOLARIAN** listed as

President of DCI, and with M.S. and **DOLARIAN**'s wife, M.A.D., as additional signers on the

account (the "DCI savings account #8329"); and, (2) a business checking account in the name

11

of DCI with JP Morgan Chase, this account was assigned account number 605982300 ("#2300") with **DOLARIAN** listed as President of DCI, and with M.S. and M.A.D. as additional signers on the account (the "DCI checking account #2300").

40.     Later that day, on June 20, 2014, M.S. withdrew $4,199,646.57 from M.S.'s Checking Account ("#2795"), and those funds were deposited into the DCI savings account ("#8329"). Further, $497,000 was transferred into the DCI checking account ("#2300"). Thus, by June 20, 2014, $4,696,646.00 of the $4,998,647.00 wire transfer was in the newly created DCI bank accounts described above.

41.     On or about June 24, 2014, DCI drew a $150,000.00 check from the DCI checking account (#2300), which was deposited into the bank account of another **DOLARIAN**-controlled company, Martel 3D, LLC. That Martel 3D bank account was a Bank of America checking account with account number 000577161654 (the "Martel 3D Checking Account"). I searched MARTEL 3D in the California Department of State database. The search revealed that M.A.D. (**DOLARIAN's** wife) was the Agent for Service for Martel 3D. The company's registered address was 2525 W Sierra Ave, Fresno, CA 93711. This was the home address of **DOLARIAN** and M.A.D.[3]

42.     On June 26, 2014, DCI transferred $600,000.00 from the DCI savings account #8329 to the DCI account checking account #2300.

43.     On June 30, 2014, DCI wired $712,051.13 to M.F., from the DCI checking account #2300 to M.F.'s Czech Republic-based bank account, UniCredit Bank account number 0000056985021.

---

[3] I believe that DOLARIAN has since separated from his wife, and he currently resides in Bulgaria.

44.     On June 26, 2014—four days prior to the $712,000 wire transfer from DCI to M.F.—DCI

and M.F. entered into an agreement whereby M.F. agreed to be a representative of DCI. The

agreement stated: "WHEREAS, Principal is a reseller/manufacture of various Defense products

of Eastern and Western origin and desires to appoint Representative as its [non-exclusive] sales

Representative to promote and sell Principal's products."

45.     On July 23, 2014, DCI transferred $3,599,823.67 from the DCI savings account #8329

back to M.S.'s Checking Account (#2975).

46.     On July 24, 2014, DCI transferred $169,717.85 from the DCI checking account #2300

back to M.S.'s Checking Account (#2975). Those two transfers left the DCI savings account

#8329 and the DCI checking account #2300 with zero balances.

47.     After July 24, 2014, just 34 days after the two DCI accounts had been opened and after

roughly $5,000,000 had flowed through them, no additional transactions would flow through

the two newly-created DCI bank accounts. They were subsequently closed.

48.     With the bulk of the Nigeria-originated funds back in M.S.'s Checking Account (#2975),

on July 29, 2014, M.S. moved $3,000,000.00 by cashier's check from M.S.'s Checking Account

(#2975) to another of M.S.'s bank accounts at JP Morgan Chase, M.S.'s money market account,

number 3302611677. On August 26, 2014, M.S. transferred an additional $160,000.00 from

M.S.'s Checking Account (#2975) to M.S.'s money market account (#1677). These transfers

were conducted with no apparent business purpose.

49.     In or around July 2014, M.S. created a new California corporation, "Arthur Ave.

Consulting, Inc." in Fresno, California. The registered agent is M.S. at 1284 W Shaw #103,

Fresno, CA 93711. **DOLARIAN** and his wife would soon after open two accounts with

Citibank in the name of Arthur Ave. Consulting, Inc. (the "Arthur Ave. Checking Account" and

13

the "Arthur Ave. Money Market Account"), and the money that originated from Nigeria would

soon flow into these two accounts.

50.     Meanwhile, on July, 8, 2014, DDTC renewed DCI's broker registration.

Notwithstanding **DOLARIAN**'s status as a registered broker, DDTC restated to **DOLARIAN**

that he was continuing to operate under a policy of presumptive denial. The DDTC

correspondence stated:

> "Notwithstanding the broker registration renewal, you and Dolarian remain under a
> presumption of denial. Our office informed you by letter dated June 20, 2013, of this action
> which applies to all future brokering requests. A presumption of denial essentially means
> that our office has placed any broker request Dolarian may make under a heightened level
> of scrutiny that will likely result in denial."

51.     On July 16, 2014, **DOLARIAN** returned into the United States through Dallas Fort

Worth International Airport. **DOLARIAN** was selected for a secondary examination and told

CBP officers that he had traveled to Bulgaria, Czech Republic, Belgium, Iraq and Turkey on

business. **DOLARIAN** told CBP officers he was in the weapons supply business and he made

this trip to meet with suppliers and executives of the companies he does business with.

52.     On August 8, 2014, DDTC returned without action ("RWA") DCI's June 19, 2014

brokering application, BA-L-039-14. The DDTC letter stated:

> "The attached application has been voided and is RETURNED WITHOUT ACTION for
> the reasons indicated below. The applicant may take necessary corrective action and
> resubmit the request as a completely new application."

The letter included the following reasons for the RWA:

> "The Office of Defense Trade Controls Compliance is conducting a review of Dolarian
> Capital Inc. and compliance with the International Traffic in Arms Regulation (22 C.F.R.
> 120-130).  That review is based in part on a series of end-use monitoring inquiries on
> previously approved brokering approvals.  Results of those inquiries raised questions about
> the validity of the proposed brokering transactions and the identity of all parties to the
> transactions.  Pending satisfaction of the review by this office, this authorization request is
> not approved at this time.

Thus, DDTC's August 8, 2014 correspondence made clear to DCI that DCI did not have DDTC

approval to broker arms to Nigeria in connection with DCI's June 19, 2014 brokering request.

53.     On August 14, 2014 **DOLARIAN** returned to the United States and was selected for a

secondary examination.  During this examination, **DOLARIAN** explained that after leaving

Iraq he traveled to the Czech Republic where he had additional business meetings including

meeting with two brokers from Nigeria that he identified as "Mamu and [H]."  **DOLARIAN**

told CBP officers that he spoke with the brokers about future business.  Based on my

knowledge of this case and my training and experience, I believe that "[H]" is the first name of

H.A., the S.E.I. representative with whom DCI had entered into Sales Agreements for arms

sales to Nigeria.

54.     I have reviewed e-mail correspondence between **DOLARIAN** and M.F.  September 2014

emails between **DOLARIAN** and M.F. indicate that even though DDTC had not authorized

DCI to conduct brokering activity, DCI had already made a down payment with a vendor to

purchase some of the weapons DCI sought to broker to Nigeria.

55.     On September 4, 2014, M.F. emailed to **DOLARIAN** to obtain a status on the acquisition

of certain items DCI sought to broker to Nigeria that were covered by the Sales Agreements and

the DCI brokering application to DDTC:

> From: [M.F.] (mailto:mgfiii@gmail.com)
> Sent: Thursday, September 4, 2014 2:14PM
> To: Ara Dolarian
> Subject: Re: Up Date
>
> So we can still manage the deal right or are the supplier chain for these particular items?

56.     Later that day, on September 4, 2014, **DOLARIAN** responded that although he had

obtained a vendor for some of those items (the 68 mm SNEB Rocket (SNEB), the DEFA Type

15

553 Cannon (DEFA), and MARTA 115 Type Launch pad (MARTA)), he was having issues

with that vendor. **DOLARIAN**'s email to M.F. indicated that DCI had already made a down

payment with that vendor:

> On Sep 4, 2014 5:35AM, "Ara Dolarian" <dolarian@dolarian.com> wrote:
>
> Our first vendor for the SNEB, DEFA, and Marta is absolutely and 100% gone and will
> not sell to the Nigerians under any circumstance. Do not have the Nigerian's produce
> another EUC for the SNEB, DEFA, and or Marta until instructed.
>
> In the next few days or as soon as I get my money back from the first vendor I will
> instruct on who the second vendor is. Export will not be Bulgaria for the SNEB, DEFA,
> and Marta.

57.     The next day, on September 5, 2014, M.F. asked for clarification on how much the new

vendor would charge for those weapons:

> From: [M.F.] (mailto:mgfiii@gmail.com)
> Sent: Friday, September 05, 2014 2:30AM
> To: Ara Dolarian
> Subject: RE: Up Date
>
> How Much? I thought you had released the first vendor anyway? I do remember you
> telling me about this better source. I will be back in Prague tomorrow. You in Kiev? You
> need some help?

58.     **DOLARIAN** responded that he was in active negotiations with a second vendor

regarding the acquisition of the weapons:

> On Sep 5, 2014 4:21AM, "Ara Dolarian" < dolarian@dolarian.com> wrote:
>
> The DEFA, MARTA and SNEB, I will have secure by Sunday morning. . . . The first
> vendor will not return the deposit as I expected.

59.     The weapons mentioned in the above emails are the same items covered by the June 2014

Sales Agreements between DCI and S.E.I., for which DCI sought DDTC approval, which was

denied on August 8, 2014. These emails indicate that not only did DCI make a deposit for the

purchase of weapons even though it had not obtained DDTC's approval, but that DCI continued

to actively negotiate for the acquisition of those weapons in September 2014, after DDTC had

expressly denied DCI's brokering request.  Based on my training and experience, I believe that

both actions violate the AECA and ITAR.

60.     Throughout September 2014, DCI, **DOLARIAN** and M.S. also continued to move the

proceeds of the June 17, 2014 $4,998,647.00 wire they had received from Sawki.

61.     On September 5, 2014, M.A.D. opened a second Martel 3D bank account, a Bank of

America savings account number 325016557963 (the Martel 3D Savings Account). M.A.D. is

the sole authorized signer on the account, as the "Manager" of Martel 3D.

62.     On September 8, 2014, M.S. purchased a $3,200,000.00 cashier's check ($3,000,000.00

from M.S.'s money market account (#1677) and $200,000 from M.S.'s Checking Account

(#2975).  That $3,200,000.00 cashier's check was deposited into the Martel 3D Savings

Account.

63.     Three days later, on September 11, 2014, more Nigerian funds arrived into M.S.'s

Checking Account (#2975): S.E.I. wired $3,620,000.00 to M.S.'s JP Morgan Chase account

(#2975).

64.     On September 12, 2014, the day after those funds were received, M.S. transferred

$3,600,000 out of M.S.'s Checking Account (#2975) and into M.S.'s money market account

(#1677).

65.     On September 23, 2014, M.S. purchased a cashier's check in the amount of

$3,626,855.52.  Of that amount, $3,263,412.61 was withdrawn from M.S.'s money market

account (#1677) and $363.442.91 was withdrawn from M.S.'s Checking Account (#2975).

That $3,626,855.52 cashier's check was deposited into the Martel 3D Savings Account.

66.     Thus, after the deposits of the September 8, 2014 and September 23, 2014 cashier's

checks, a total of $6,826,855.52 in Nigeria-originated funds had been funneled from M.S.'s

accounts into the Martel 3D Savings Account.  That money would soon move again.

67.     On September 26, 2014, **DOLARIAN** opened a Citibank checking account, number

205912785 (2785) in the name of Arthur Ave. Consulting, Inc. (the "Arthur Ave. Checking

Account").  **DOLARIAN** and M.A.D. were co-signers on the account.  On October 2, 2014,

Martel 3D transferred $350,000.000 (by cashier's check) to the Arthur Ave. Checking Account.

68.     On October 14, 2014 and November 10, 2014, $80,763.70 and $100,000.000,

respectively, were transferred from the Martel 3D Savings Account to the Martel 3D Checking

Account.

69.     On November 25, 2014, **DOLARIAN** opened a second Arthur Ave. Consulting bank

account at Citibank, money market account, number 206054579 (the "Arthur Ave. Money

Market Account").  **DOLARIAN** and M.A.D. were co-signers on the account.  On November

28, 2014, Martel 3D transferred $4,000,000.00 (by cashier's check) from the Martel 3D Savings

Account into the Arthur Ave. Money Market Account.

70.     Open source checks and California Corporation records reveal that Arthur Ave.

Consulting, Inc. was incorporated in Fresno, California. The registered agent was M.S. at 1284

W Shaw #103, Fresno, CA 93711.

71.     I conducted online research and found no advertisements, internet presence, or listings on

business websites associated with Martel 3D or Arthur Ave. Consulting.  There is also no

readily discoverable information that explains the purpose of either business.  In my training

and experience, companies actively involved in commerce advertise in a number of ways and

seek to inform the public about the existence and purpose of their company in order to obtain

18

interested customers.  Based on my training and experience, DCI, **DOLARIAN**, and M.S. appear to have used, at least in part, these entities and their associated accounts to move the funds to make the source of the Nigerian-originated money more difficult to trace.

72.    On January 8, 2015, **DOLARIAN** and M.A.D. traveled to Paris, France.  I believe that this meeting was related to the above-described arms deal because I am unaware of any other business dealings that **DOLARIAN** had with S.E.I.  While in Paris, **DOLARIAN** was placed under surveillance by French authorities. On January 9, 2015, between 10:45 am and 11:15 am, authorities witnessed **DOLARIAN** with an individual they identified as H.A. of S.E.I.

73.    On January 10, 2015, French authorities witnessed **DOLARIAN** get into a car driven by H.A.  Between 10:50am and 2:30pm, **DOLARIAN** and H.A. drove through Paris, making several stops, including at an apartment building near the Angolan Embassy and a Maserati dealership.  At 2:30pm, H.A. and **DOLARIAN** returned to **DOLARIAN**'s hotel and H.A. departed.  On January 12, 2015, **DOLARIAN** and M.A.D. traveled to Sofia, Bulgaria.  M.A.D. nreturned to the United States on January 16, 2015, and **DOLARIAN** traveled to Cairo, Egypt.

**[CONTINUED ON NEXT PAGE]**

# Summary Chart
# DCI/Dolarian 2014 Brokering Activity
### (All dates are on or about, all dollar values rounded)
### (Accounts in Red Are Accounts Holding Positive Balance of Proceeds of Illegal Brokering)



20

## V.   **CONCLUSION**

Based on the foregoing, I have probable cause to believe that **ARA GARABED**

**DOLARIAN** and his co-conspirators have committed the offenses of Conspiracy in violation of

Title 18, United States Code, Section 371; Illegal Arms Brokering in violation of Title 22, United

States Code, Section 2778; and Money Laundering in violation of Title 18, United States Code,

Sections 1956 and 1957.  I therefore request that the court issue a warrant authorizing the arrest

of **ARA GARABED DOLARIAN**.

JEREMY KISER
Special Agent
Homeland Security Investigations

Approved as to form:

/s/ GRANT B. RABENN
GRANT. B. RABENN
Assistant United States Attorney

Subscribed and sworn to before me this ____ 15 ____ day of May, 2019.

HON. ERICA P. GROSJEAN
United States Magistrate Judge

21